# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 983 | **DATE** | 12/3/2004 |
| **CASE TITLE** | United States of America vs. Nikita Hampton, Adedejo Okunola and Crystal Blair | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Hampton's Motion to Suppress is DENIED and Okunola's Motion to Suppress is GRANTED as to his statements while in police custody but DENIED as to the evidence seized at the residence on October 10, 2003.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 06 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
DEC 3 2004
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

UNITED STATES OF AMERICA,

Plaintiff,

v.

NIKITA HAMPTON, ADEDEJO
OKUNOLA and CRYSTAL BLAIR,

Defendants.

Case No. 03 CR 983

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Nikita Hampton (hereinafter, "Hampton") and Adedejo Okunola's (hereinafter, "Okunola") Motions to Suppress. For the following reasons, Hampton's Motion is denied and Okunola's Motion is denied in part and granted in part.

### I. INTRODUCTION

Defendants' Motions arise from the October 10, 2003 search of an apartment located at 869 North Cambridge in Chicago, Illinois ("the residence"). On the morning of October 10, 2003, police officers received a tip from an informant that a suspected bank robber, who had robbed a series of Chicago-area banks at gunpoint over the preceding months, was located at the residence. A group of Chicago police officers and FBI agents assembled outside the residence and at approximately 3:50 p.m. knocked on the door. Frankie White ("White"), Okunola's mother and Hampton's fiancé, opened the door.



The respective stories differ significantly from this point forward. According to the Government, White immediately cooperated and allowed agents to search her home for the suspected bank robber. Defendants contend that White did not consent to the police officers' initial entry and search. During the search and protective sweep of the home, police officers located and immediately arrested Hampton on an upstairs floor. They also observed a handgun in the upstairs bedroom used by Hampton and White. Okunola was apprehended on the downstairs floor, where he was sitting on a sofa. After searching White's purse outside the home, where they found a baseball cap purportedly used in some of the bank robberies, police officers detained White. Both White and Okunola were then taken into custody for questioning.

Once at the police station, at approximately 4:50 p.m., Okunola signed a written consent to search the residence. Approximately thirty minutes thereafter, White signed a similar written consent. (Both White and Okunola are leaseholders on the residence.) Following Okunola's written consent, police then searched the residence and seized various evidentiary materials purportedly related to a variety of bank robberies. Police officers did not obtain arrest or search warrants. Defendants contend that White's written consent to search was improperly obtained because, among other reasons, police officers wrongfully threatened White with eviction from her public housing. Defendants

also contend that Okunola's written consent to search was invalid because it was the product of an unlawful arrest and, moreover, that he was coerced into signing it.

During his detention, Okunola also provided incriminating statements pertaining to his and Hampton's involvement in a prior bank robbery. Okunola seeks to suppress his statements on the basis that he was illegally detained and police officers improperly failed to provide him with *Miranda* warnings.

Defendants now move to suppress all evidence obtained from the residence on October 10, 2003. Okunola also moves to suppress all statements made by him while in custody on October 10, 2003. An evidentiary hearing was held on October 28, 2004, during which several police officers and FBI agents testified on behalf of the Government, and White, Okunola, and Morrison Hunley testified on behalf of the Defendants.

## II. DISCUSSION

### A. White's Initial Consent to Search the Residence

Defendants first argue that the Government has not shown that White's initial consent to search the residence for Hampton was voluntary. Defendants rely primarily on testimony from White, in which she claims that consent was never requested, and police instead rushed into the home. *See* Hr'g Tr. at 191-92. The Government, in turn, relies primarily on the testimony of Detective Graeber, and also certain corroborating testimony from other

- 3 -

officers and agents, which collectively indicate that consent was requested and received. *See* Hr'g Tr. at 24, 102, 107, 127-28, 147.

The Court finds that the Government met its burden on this issue. Detective Graeber's testimony was credible, and was buttressed by the testimony of Detective Matias and Agent Araya, although these two individuals admitted that they did not hear the specifics of White's consent. *See id.* In contrast, White's testimony was less credible. In addition to an obvious (and understandable) potential bias to protect her child (Okunola) and her fiancé (Hampton), White's other testimony pertaining to the discovery of a baseball cap in her purse and other evidentiary material was simply not credible, and provided a general sense of obfuscation. Thus, the Government established by a preponderance of the evidence that White's initial consent was valid.

### B. Okunola's Unlawful Arrest

A threshold issue here is whether the detention of Okunola at the 18th District police station was lawful. Upon the police officers' entry to the residence, Okunola was immediately handcuffed and was then quickly transported to the police station. He remained handcuffed to the wall in a holding room at the police station for more than six hours. It is not clear from the Government's briefing whether it concedes that Okunola's detention was, from the outset, effectively an arrest, or whether there was some particular point in time when the temporary detention

transformed into an arrest. *See Terry v. Ohio*, 392 U.S. 1 (1968); Gov. Reply Br. at 3-4. The Government, however, appears to acknowledge in its reply brief that at *some* point probable cause was required to continue to detain Okunola. *See* Gov. Reply Br. at 3-4.

In any event, the undisputed testimony at the evidentiary hearing demonstrates that, certainly at the point that Okunola was handcuffed to the wall at the Chicago police station, his detention was the functional equivalent of an arrest. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985); *Kaup v. Texas*, 538 U.S. 626, 630 (2003); *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir. 2004); *Maxwell v. City of Indianapolis*, 998 F.2d 431, 433 (7th Cir. 1993). That is, it is patently clear that any reasonable person, upon being handcuffed, transported to a police station, restrained to a wall, and then interrogated, would not feel at "liberty to ignore the police presence and go about his business." *Kaup*, 538 U.S. at 629 (quotations and citations omitted). Thus, the Government must establish that it had probable cause to conduct this warrantless arrest of Okunola.

Probable cause to conduct a warrantless arrest is a fluid concept that depends on the known facts and circumstances at the time of the arrest. *See generally, Ornelas v. United States*, 517 U.S. 690, 695-96 (1996); *see also, Wong Sun v. United States*, 371 U.S. 471, 479 (1963). The fundamental inquiry is whether a prudent

person would believe that an offense has been (or is being) committed by the person to be arrested. *See id.* Here, the Government is faced with a significant obstacle: Detective Graeber, the lead investigator here, flatly admitted that at the time of Okunola's detention in the residence he had no belief that Okunola had committed a crime. *See* Hr'g Tr. at 27:22-25; 28:1; 65:11-13. He further conceded that he merely wanted to take Okunola "in for investigation just to see whether he was willing to tell us anything relative to Mr. Hampton or to the possibility that he might have been involved in any of the robberies in any way whatsoever." *Id.* Indeed, the testimony at the evidentiary hearing revealed that the police entered the residence with the unitary focus of locating Hampton, and, upon encountering Okunola on the ground floor, the police immediately recognized that he did not fit the description of Hampton. *See* Hr'g Tr. at 85, 128.

The Government essentially ignored the issue of probable cause in its initial brief, but then wisely addressed it in its reply brief. To establish probable cause, the Government turns to the fact that police were purportedly looking for a second offender in the bank robberies. This argument, however, is flawed in several regards. First, the informant had identified Tony Glass as a potential accomplice, and police apprehended Glass in the immediate vicinity of the residence just before entering the residence. *See id.* at 52. Therefore, at least at that point in time, the likely

- 6 -

second suspect was already in custody, which significantly reduced the likelihood that Okunola was that second suspect. Second, the Government simply provided no evidence that Okunola had any particular physical similarity to the second offender. For instance, Detective Graeber testified regarding a "business alert" photograph of a second suspect, but the sole connection between the photograph and Okunola seems to be that both are black men. *See* Hr'g Tr. at 47-48. The business alert identifies the second suspect's age range as 30-to-35 and his weight as 230 to 250 lbs. Okunola clearly does not match these characteristics – and the police immediately recognized that Okunola was too young to match Hampton's described age of 30-to-35. *See* Hr'g Tr. 85, 128. Thus, Detective Graeber's testimony does not persuasively indicate that a reasonably prudent officer would believe that Okunola was likely to be the second suspect. Indeed, Detective Graeber's other testimony more-fairly reveals the true state of mind of a reasonable officer at the time of Okunola's detention: Okunola was not suspected of any criminal activity at the time of his detention. *See* Hr'g Tr. at 64-65.

Finally, the Government argues that the surrounding circumstances, namely, the presence of Hampton in the residence, the gun discovered upstairs, and White's concealment of a baseball cap, collectively create probable cause to conduct a warrantless arrest of Okunola. This argument fails because the Government

- 7 -

fails to show - as it was required to show - that there was some logical connection between these events and Okunola. Although the authority cited by the Government supports the general proposition that surrounding circumstances can create probable cause, closer inspection of the facts in these cases shows that there must be some nexus between a suspect and incriminating behavior or circumstances. That is, the surrounding circumstances alone cannot replace the requirement of some minimal form of individualized probable cause. *See Ybarra v. Illinois*, 444 U.S. 85 (1979).

For instance, in *Hayes*, an informant specifically identified the suspect as having a gun, and the police officers observed the suspect attempting to hide the gun and then fleeing the scene. *See United States v. Hayes*, 236 F.3d 891, 894 (7th Cir. 2001). Similarly, in *Townsend*, the police officer observed a weapon on the suspect and noticed the suspect's "nervous manner" (not to mention that the police were also aware that the suspect had purchased chemicals related to the manufacture of methamphetamine and was recently involved in an explosion of a methamphetamine laboratory). *See United States v. Townsend*, 330 F.3d 438, 441 (6th Cir. 2003). In *Holder*, the suspect was standing a few feet away from a "drug-laden table," and thus was undeniably aware of illicit drug activity. *See United States v. Holder*, 990 F.2d 1327, 1329 (D.C. Cir. 1993). Perhaps the best case for the Government is the Tenth Circuit's *Dozal* decision, where a suspect was arrested primarily on

the basis that police discovered two bags on cocaine in a shared bathroom. *See United States v. Dozal*, 173 F.3d 787, 793 (10th Cir. 1999). But even in that case, the police nonetheless found incriminating evidence in an area of the home regularly used by the suspect, and thus a logical connection was established.

Curiously, the Government cites only one Seventh Circuit case in support of its probable cause argument based on surrounding circumstances, despite a plethora of case law in this circuit addressing the requirements of individualized probable cause. *See, e.g., United States v. Johnson*, 170 F.3d 708, 714 (7th Cir. 1999); *United States v. Carpenter*, 342 F.3d 812, 815-16 (7th Cir. 2003); *United States v. Jones*, 72 F.3d 1324, 1332-33 (7th Cir. 2003)(and cases cited therein). In any event, the Seventh Circuit clearly follows the general contours of *Ybarra v. Illinois*, which requires at least some minimal form of individualized probable cause in addition to mere association with someone suspected of criminal activity. *See Ybarra v. Illinois*, 444 U.S. 85 (1979); *id*.

Here, the Government failed to show the necessary nexus between Okunola and the incriminating evidence observed *at the time of the arrest*. For instance, there was no testimony that Okunola engaged in any suspicious behaviors prior to his arrest: he did not flee, attempt to hide any evidence, or otherwise act in any manner arising suspicion. As noted above, the search for a second suspect was attenuated, given the preceding arrest of Glass, and nothing in

the business alert photograph truly pointed toward Okunola. The gun observed by the police was in a bedroom used by White and Hampton, on a different floor from where Okunola was located when police entered the residence. In addition, White's concealment of the baseball cap occurred outside of the presence of Okunola. Finally, Okunola, as a leaseholder and the son of White, had a legitimate non-criminal reason to be present at the residence.

In short, there appears to be nothing outside of his mere presence at the residence and association with Hampton (who was arrested) and White (who, curiously, was not) that contributed to a probable cause determination. These, however, are not sufficiently compelling surrounding circumstances: something more than propinquity with others suspected of criminal activity is required for probable cause. *Cf. Johnson*, 170 F.3d at 714; *Carpenter*, 342 F.3d at 815-16; *Jones*, 72 F.3d at 1332-33. Otherwise, taken to its logical extension, the Government's argument here would dictate that there was sufficient probable cause to arrest *anyone* present at the residence without any need for individualized assessments.

### C. Consequences of the Okunola's Unlawful Arrest

#### 1. Suppression of Evidence Obtained at 869 N. Cambridge

Consent to search that is given pursuant to an unlawful arrest is presumptively invalid. See *Cellitti*, 387 F.3d at 622. And, accordingly, subsequent evidentiary searches and seizures that

depend upon such invalid consent are likewise tainted and inadmissible. *See id.; Wong Sun v. United States*, 373 U.S. 471 (1963). Here, Okunola's consent occurred less than one hour after his illegal arrest, and therefore it is not sufficiently attenuated from the arrest. *See id.* Thus, under the normal course, the evidence obtained at the residence subject to Okunola's invalid consent would be tainted and therefore suppressed. *See id.*

There are, however, two notable exceptions to the general rule: the "independent source" and "inevitable discovery" doctrines. *See United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004), *citing Murray v. United States*, 487 U.S. 533, 537 (1988). These two similar doctrines allow tainted evidence to be used if the evidence was either obtained by any other legal means, or would have been obtained legally in any event. *See id.* Here, the independent source doctrine (and perhaps the inevitable discovery doctrine) applies because White provided independent written consent to search the residence.

As stated above, there was credible testimony that White consented to the initial search of her home. Unlike Okunola, White was not arrested (nor was her detention the functional equivalent of an arrest), and therefore her written consent is not tainted by an unlawful arrest. Finally, there was credible testimony by the Government that White voluntarily signed the consent to search form, which was buttressed by testimony that White thereafter

supervised a large portion actual search as it occurred in her home, and did not protest during her observation of the search. See Hr'g Tr. at 112-17.

Importantly, White's written consent was provided within 30 minutes of Okunola's consent. See id. at 115. Although the evidentiary search and seizure appears to have been initially predicated on Okunola's tainted consent, it is clear that White's nearly-contemporaneous written consent provided an independent legal basis for the evidentiary search and seizure. (And, as a leaseholder and occupant of the bedroom where the weapon and other materials were found, there is no question that White had authority to provide consent for all areas of the residence. See United States v. Matlock, 415 U.S. 164, 170 (1974)). Thus, under the terms of the independent source doctrine, the evidence seized at the residence is not fatally tainted by the Okunola's invalid consent, and therefore should not be suppressed.

### 2. Suppression of Okunola's Incriminating Statements

The independent source and inevitable discovery doctrines do not provide refuge for Okunola's incriminating statements. As noted above, Okunola provided several incriminating statements while in custody over the course of the afternoon and evening of October 10, 2003. These statements clearly flowed directly from his illegal arrest and are therefore tainted and inadmissible against him. See Wong Sun, 373 U.S. at 484-85.

Unlike the evidentiary search and seizure at the residence, there is no other legal basis that shields the police conduct here. As a result, Okunola's statements must be suppressed insofar as they are to be used against him. (Hampton, of course, does not have standing to challenge the use of Okunola's statements on the grounds that they were obtained in violation of Okunola's Fourth Amendment rights. *See generally Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978)).

### III. CONCLUSION

For the foregoing reasons, Hampton's Motion to Suppress is **DENIED** and Okunola's Motion to Suppress is **GRANTED** as to his statements while in police custody but **DENIED** as to the evidence seized at the residence on October 10, 2003.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: November 3, 2004